2016 IL App (2d) 150860
No. 2-15-0860
Opinion filed June 23, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| AUTO-OWNERS INSURANCE COMPANY, as Subrogee of Eric B. Bettag, | ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 11-AR-1218 |
| RICHARD J. KONOW, | ) ) | |
| Defendant and Third-Party Plaintiff-Appellant | ) ) ) | |
| (Eric B. Bettag and Joseph Sauber, Third-Party Defendants). | ) ) ) | Honorable Joseph M. Grady, Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hutchinson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant and third-party plaintiff, Richard J. Konow, appeals from a judgment for $28,000.38 entered in favor of plaintiff, Auto-Owners Insurance Company (Auto-Owners), as subrogee of third-party defendant Eric B. Bettag.   Auto-Owners filed suit against Konow, seeking recovery for property damage to a motor vehicle owned by Bettag and insured by Auto-Owners.   Konow and Bettag were involved in a motor-vehicle accident on March 13, 2007, in which Bettag was seriously injured.   Bettag's injuries were the subject of an earlier lawsuit (the Bettag lawsuit), in which Bettag sought recovery from Konow on the basis that Konow's

negligence was the proximate cause of Bettag's injuries. Bettag's wife, Joan, sought recovery for loss of consortium. Konow and the Bettags settled the lawsuit for the policy limits of Konow's insurance coverage for the accident. At the direction of the Bettags' attorney, a portion of the proceeds of the settlement was tendered to Auto-Owners. In this appeal, Konow argues that Auto-Owners' acceptance of the tendered amount constituted an accord and satisfaction discharging Auto-Owners' subrogation claim. We affirm.

¶ 2 The record reveals that the complaint in the Bettag lawsuit, as amended, alleged that "Eric Bettag's automobile was destroyed and rendered worthless and Eric Bettag has been deprived of the use of the automobile from the date of the collision." The amended complaint included a *respondeat superior* claim against Konow's employer. On March 16, 2009, Auto-Owners filed a complaint in intervention in the Bettag lawsuit, naming Konow as defendant. Paragraphs 5 through 7 of the complaint in intervention alleged as follows:

"5. In his Complaint, the Plaintiff BETTAG has alleged that KONOW was guilty of negligence and other wrongful acts, which conduct caused the accident resulting in his injuries. In his Complaint, the Plaintiff seeks compensatory damages including damages for his injuries and the destruction of his vehicle.

6. Pursuant to the policy of insurance between BETTAG and AUTO OWNERS, AUTO OWNERS is entitled to recover from the proceeds of the above-captioned action for the value of benefits and services provided to or on behalf of NAKLICKI [*sic*] for benefits paid and treatment of the injuries he sustained in the Accident ($5,000.00), as well as the damages paid for the destruction and loss of his vehicle ($29,800.38). ***

7. If it is ultimately determined that [Konow] was guilty of negligence in said accident which resulted in the injuries sustained by BETTAG and for which AUTO

OWNERS provided necessary benefits and services, then AUTO OWNERS is entitled to receive from the Defendants, the value of benefits and services paid under the [policy] to or on behalf of BETTAG for benefits paid and treatment of the injuries he sustained in the Accident."

¶ 3    On August 11, 2009, in exchange for the payment of $3 million, the Bettags executed a release of "any and all claims *** which they have had, now has [*sic*], or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, loss of consortium, loss of service and property damage, and the consequences thereof, resulting or to result from [the March 13, 2007, collision]." On September 10, 2009, the Bettags' attorney, Joseph Sauber of the law firm of Shearer and Agrella, wrote a letter to Mark A. Pheanis, the attorney representing Konow in the Bettag lawsuit. The letter stated in pertinent part:

"[W]e have resolved all lien claims with respect to [the Bettag lawsuit]. Enclosed you will find letters confirming the 'settlement amounts' with respect to each lien. Further, this letter will serve as this firm's acknowledgment of the amount due on its attorney's lien.

Please have [Konow's insurer] issue the following checks in the following amounts:

| | |
|---|---|
| BlueCross BlueShield | $ 120,000.00 |
| Rehabilitation Institute of Chicago | $ 74,779.10 |
| Delnor Community Hospital | $ 16,000.00 |
| Auto Owners Insurance Company | $ 3,333.33 |
| Shearer & Agrella | $ 600,000.00 |

| | |
|---|---|
| Eric Bettag | $2,185,887.57" |

¶ 4    Konow's insurer issued a settlement check in the amount of $3,333.33, payable to the Bettags and to Auto-Owners. The Bettags endorsed the check and Sauber then forwarded it to Trans Pac Solutions (Trans Pac), which acted as Auto-Owners' agent for the collection of subrogation claims.

¶ 5    In a letter to both Sauber and Pheanis dated October 21, 2009, Auto-Owners' attorney, Julie Line Bailey, wrote in pertinent part as follows:

"It is our understanding that [Konow's] insurer has tendered a Three Million Dollar policy to [the Bettags]. Auto-Owners did receive a check for $3,333.33, representing its $5,000 medical payments lien, less a one-third deduction for attorney's fees pursuant to the common fund doctrine. Auto-Owners has yet to receive any payment for its collision claim, recovery of which was also expressly sought by plaintiff Bettag in *** the Amended Complaint.

Because [the Bettags'] Amended Complaint sought recovery of the collision damages, Auto-Owners was willing to reduce its collision claim by one-third ($19,008.25) for attorney fees pursuant to the common fund doctrine. However, Joe Sauber advised me by telephone yesterday that his client is refusing to reimburse Auto-Owners for the total loss payments from the Three Million Dollar policy tender, and that Auto-Owners should take whatever legal methods it felt necessary to collect the collision lien. In previous conversations with Mr. Pheanis, he indicated that the policy tender was intended to effect a settlement of both actions in their entirety, which would include the collision claims in both complaints."

¶ 6    The settlement check was negotiated on October 26, 2009.  During the proceedings below, a copy of the check was admitted into evidence, over Auto-Owners' objection.  The words "In full and final settlement of any and all claims" appear next to the Bettags' endorsements on the check.  Trans Pac endorsed the check on behalf of Auto-Owners, with the words "All Rights Reserved" appearing beneath the endorsement.

¶ 7    At this point, we find it appropriate to take judicial notice of our own records (see *People v. Eubanks*, 283 Ill. App. 3d 12, 24 (1996)), in order to describe subsequent events in the Bettag lawsuit that are outlined in our decision in *Bettag v. Konow*, 2011 IL App (2d) 101188-U.  As we noted in that decision, on December 23, 2009, Auto-Owners filed an amended complaint in intervention seeking recovery from the Bettags.  *Id.* ¶¶ 5-6.  Auto-Owners alleged that, by executing a release of their claims against Konow and his employer, the Bettags violated a provision of the policy prohibiting them from doing anything to prejudice Auto-Owners' subrogation rights.  *Id.* ¶ 6.  The trial court entered summary judgment for Auto-Owners on its claims against the Bettags and dismissed Auto-Owners' remaining claims in the Bettag lawsuit without prejudice.  We reversed the summary judgments against the Bettags, reasoning that the release executed by the Bettags did not foreclose Auto-Owners from seeking recovery from Konow and his employer.  *Id.* ¶ 10.

¶ 8    Auto-Owners thereafter filed the subrogation lawsuit giving rise to this appeal and Konow pleaded the affirmative defense of accord and satisfaction.  The matter proceeded to a bench trial at which the question of damages was not seriously contested.  Juliana Guzman, who was employed by Auto-Owners as a claim representative, identified business records showing that an insurance adjuster who assessed the damage concluded that, before the March 13, 2007, accident, the book value of Bettag's vehicle was $27,025, and purchasing a replacement would

cost an additional $2,106.88 in taxes and license fees. The adjuster estimated that the cost of repairing the vehicle would exceed its book value. During direct examination of Guzman, the following exchange took place with reference to the records in question:

"Q. And are those records that were made by a person with knowledge of—or made from information transmitted by a person with knowledge of the acts and events that appear in those documents?

A. Correct.

Q. And were those records made at or near the time of the acts and events that appear in those documents?

A. Yes.

Q. And is it the regular practice of Auto-Owners Insurance Company to make and/or rely upon records such as this?

A. Yes.

Q. And were these records kept in the course of the regular conducted business activity of Auto-Owners Insurance Company?

A. Yes."

The trial court admitted the records into evidence, noting Konow's objection that the records were created before Guzman began her employment with Auto-Owners. Guzman further testified that Auto-Owners made payments to the Bettags for the property damage to the vehicle and for Eric Bettag's medical expenses.

¶ 9    Konow argues on appeal that there was an accord and satisfaction when his insurer issued, and Auto-Owners negotiated, a check for $3,333.33, designated as "full and final settlement of any and all claims." The defense of accord and satisfaction pertains to a

contractual method of discharging a debt or claim. *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1071 (1995). A creditor's acceptance of a payment of less than the amount claimed "will not constitute an accord and satisfaction of the entire claim unless it can be demonstrated that the creditor intended to accept it as full satisfaction." *State Farm Automobile Insurance Co. v. Easterling*, 2014 IL App (1st) 133225, ¶ 36. Under traditional contract principles, where a claim is unliquidated or the subject of a fair dispute, the tender to the creditor of a check that is designated in writing as "payment in full" constitutes an offer to settle the claim. *Shea, Rogal & Associates, Ltd. v. Leslie Volkswagen Inc.*, 216 Ill. App. 3d 66, 71 (1991). "If the creditor takes and keeps the payment with actual or constructive knowledge of the condition, he has accepted the offer and the original debt is settled for the reduced amount." *Id.*

¶ 10    As noted in *Fremarek*:

"The 'accord' itself is the actual agreement between the parties while the 'satisfaction' is its execution or performance. As in all contracts, courts must look to the parties' intent to determine whether or not the transaction constitutes an accord and satisfaction. [Citation.] Such intent is often reflected in the good-faith negotiation of an instrument.

Illinois, like most [s]tates, has adopted its own version of the Uniform Commercial Code with respect to the negotiation or use of an instrument in effecting an accord and satisfaction. [Citation.] The Uniform Commercial Code—Negotiable Instruments (Code) provides in pertinent part:

'§ 3-311. Accord and satisfaction by use of instrument.

(a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full

satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.' [Citation.]

Thus, in order to establish an accord and satisfaction, a party must ordinarily prove that he or she acted in *good faith* in tendering an instrument as full satisfaction of a claim and that the amount of the claim was either unliquidated or the subject of a bona fide dispute. The drafters' comments to section 3-311 point out that 'good faith' is defined in the Code as not only honesty in fact, but also the observance of reasonable commercial standards of fair dealing. They further indicate that the meaning of 'fair dealing' will depend upon the facts of each case." (Emphasis in original.) *Fremarek*, 272 Ill. App. 3d at 1071-72.

¶ 11 On review after a bench trial, we may reverse only if the trial court's judgment is against the manifest weight of the evidence. *Allied American Insurance Co. v. Ayala*, 247 Ill. App. 3d 538, 549-50 (1993). In this case, the record does not establish that the $3,333.33 check issued by Konow's insurer was tendered as a good-faith settlement of an honest dispute of Auto-Owners' property-damage claim. There appears to be no evidence that, prior to the tender of the check, there were direct negotiations between Konow's counsel and Auto-Owners. Konow had already received a release from the Bettags, reciting that the Bettags' claims against Konow in the Bettag

lawsuit had been settled for $3 million. Konow's insurer issued the $3,333.33 check at the direction of the Bettags' attorney, in connection with the settlement of *their* claims. The check therefore served as partial satisfaction of the Bettags' claims against Konow. Konow and his attorney might have been under the impression that the Bettags' payment of a portion of the settlement proceeds to Auto-Owners would effectively discharge whatever subrogation claim Auto-Owners had against Konow. Had that come to fruition, it would have been an incidental benefit of the settlement. Ultimately, however, Konow tendered the check to carry out his settlement with *the Bettags*, not with Auto-Owners.

¶ 12    At trial, Auto-Owners presented evidence that the Bettags' vehicle was a total loss, that the vehicle had a book value of over $27,000, and that it would cost over $2,000 in taxes and license fees to replace the vehicle. The evidence was essentially unchallenged and we find nothing in the record to suggest that, when the $3,333.33 check payable to the Bettags and Auto-Owners was issued, Konow had any good-faith basis to dispute these figures or to dispute that Auto-Owners had an additional subrogation claim for the $5,000 paid for treatment of Eric Bettag's injuries. Nor does it appear that, at the time in question, there was any good-faith basis for Konow to believe that he was not liable for the property-damage claim. Tendering a check for $3,333.33—which was about 10% of the total subrogation claim for property damage and medical payments—cannot be viewed as acting in good faith. *Cf. Fremarek*, 272 Ill. App. 3d at 1072-73 (attorney did not act in good faith—and there was therefore no accord and satisfaction—where, among other things, the attorney tendered a check for $1,000 as payment in full of a workers' compensation lien in the amount of no less than $10,425.75).

¶ 13    For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 14    Affirmed.